IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES FIRE INSURANCE COMPANY,<br><br>        Plaintiff/Counter-Defendant,<br><br>vs.<br><br>GREATER MISSOULA FAMILY YMCA,<br><br>        Defendant/Counter-Claimant. | CV 19–21–M–DWM<br><br>OPINION<br>and ORDER |

This is an insurance coverage dispute between Plaintiff United States Fire Insurance Company ("US Fire") and Defendant Greater Missoula Family YMCA ("YMCA") over damage caused by an employee's methamphetamine use in YMCA's daycare. US Fire seeks a declaration that it has no obligation to pay YMCA's property damage claim under the terms of the commercial property policy ("the Policy). (Doc. 1.) YMCA has counterclaimed, (Doc. 10), and both parties seek summary judgment, (Docs. 23, 30).[1] YMCA's motion is granted, and US Fire's cross-motion is denied.

---

[1] This was originally a "partial motion" in light of the other counts in YMCA's counterclaim. However, Counts 2 and 3 have been dismissed pursuant to the parties' stipulation. (*See* Doc. 22, 35.) The present motion is therefore dispositive of all issues in the case.

1

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are material if they have the potential to affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The substantive law of Montana, the forum state, applies to this diversity action. *Med. Lab. Mgmt. Consult. v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

## ANALYSIS

"The interpretation of an insurance contract is a question of law." *United Nat'l Inc. Co. v. St. Paul Fire & Marine Ins. Co.*, 214 P.3d 1260, 1265 (Mont. 2009). "[W]hen the language of a policy is clear and explicit, the policy should be enforced as written." *Id.* Giving the words of a contract their ordinary meaning, insurance policies are strictly construed against the insurer in favor of the insured and in the favor of extending coverage. *Travelers Cas. & Sur. Co v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 474 (Mont. 2005). Ambiguous contract language is interpreted to provide coverage. *Id.* Ambiguity exists, when taken as a whole, an insurance contract is reasonably subject to two different interpretations. *Id.* Interpretive differences should be resolved from the viewpoint

of a layperson untrained in law or the insurance business. *Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 672 (Mont. 2009).

The determination of whether insurance coverage exists is a two-step process. First, the insured must prove that the policy covers the loss incurred. *Ribi*, 108 P.3d at 476. Then, to avoid coverage, the insurer has the burden to show that specific policy language excludes the insured's loss. *Id*. Because exclusions from coverage "are contrary to the fundamental protective purpose of an insurance policy," they must be narrowly and strictly construed. *Newman v. Scottsdale Ins. Co.*, 301 P.3d 348, 355 (Mont. 2013) (internal quotation marks omitted). In cases when an exception to an exclusion is disputed, the burden returns to the insured to prove that the exception applies, restoring coverage. *Ribi*, 108 P.3d at 476.

Here, the material facts are generally undisputed.[2] (*See generally* Doc. 20 at ¶ 3.) In April 2018, YMCA discovered that an employee was habitually using methamphetamine in its daycare center. (*Id.* at ¶ 3(j).) To conceal her use, the YMCA employee constructed a "drug den" inside a cabinet by installing baffles, a light, shelves, and a lock to secure the cabinet door from the inside. (Doc. 30-2 at ¶¶ 2–3.) Contamination testing conducted at the daycare revealed that the employee had also likely used methamphetamine in the bathroom, laundry room,

---

[2] In its Statement of Disputed Fact, US Fire repeatedly states that facts presented by YMCA are "undisputed for the purpose of summary judgment." (*See* Doc. 30-2.) The meaning of that qualification is unclear.

3

and kitchen and that the HVAC system spread contamination throughout the premises. (*Id*. at ¶ 5.) The employee subsequently pled guilty to endangering the welfare of a child, criminal drug possession, and criminal mischief. (Doc. 20 at ¶ 3(b).) US Fire and YMCA agree that the damages sustained to the daycare resulted from the habitual use of methamphetamine by an employee and that the property was covered by the Policy at the time of the incident. They dispute the application of the Policy's pollution and the criminal acts exclusions. Ultimately, the damage caused by the employee's methamphetamine use is covered.

I. Pollution Exclusion

The Policy's pollution exclusion bars coverage for the "[d]ischarge, dispersal, seepage, migration, release or escape of 'pollutants' unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the 'specified causes of loss.'" (Doc. 20 ¶ 3(f).) The term "pollutants" is defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (*Id.* at ¶ 3(g).) The "specified causes of loss" include "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage." (*Id.* at ¶ 3(h).) In short, the Policy

bars a claim for contamination but restores coverage for, relevant here, damage caused by "vandalism" and "smoke."

A.     **Application of the Exclusion**

As the insurer, US Fire has the burden of proving that the exclusion applies. *Ribi*, 108 P.3d at 476. YMCA makes a half-hearted attempt to argue that methamphetamine contamination does not inherently meet the definition of a "pollutant." (*See* Doc. 32 at 17–18.) That argument is belied by the plain language of the Policy, (*see* Doc. 20 at ¶ 3(g) (including "contaminant" in definition of "pollutant")), the undisputed facts agreed to by the parties, (*see* Doc. 30-2 at ¶ 6 (describing chemical composition of contamination)), and the parties' extensive argument on the fundamental nature of methamphetamine particulate. Because US Fire has met its burden, YMCA must show that the damage is excepted from the exclusionary language. *Ribi*, 108 P.3d at 476. YMCA argues that the damage was caused by either "vandalism" or "smoke," which are both "specified causes of loss" that would restore coverage.

B.     **Vandalism Exception**

"Vandalism" is listed as a "specified cause[] of loss." (Doc. 20 at ¶ 3(h).) The Policy does not define the term and Montana courts have not addressed or defined it in the context of insurance coverage. It must therefore be assigned its usual meaning. *Ribi*, 108 P.3d at 474. "Vandalism" is commonly understood as

5

the deliberate destruction of or damage to property. *Black's Law Dictionary* 1692 (9th ed. 2009); *Merriam Webster's Collegiate Dictionary* 1306 (10th ed. 1997) (defining "vandalism" as the "willful or malicious destruction or defacement of public or private property"). While the parties largely agree on this definition, US Fire argues that the term requires a specific intent to destroy and that the damage resulting from the YMCA employee's methamphetamine use was neither intended nor reasonably expected. While YMCA agrees that vandalism must be malicious or willful to some degree, it argues that the intentional disregard of another's property interest satisfies the intent requirement.

The parties rely primarily on three cases, which involve damages caused by a residential tenant from the distillation of moonshine, *Livaditis v. Am. Cas. Co.*, 160 S.E.2d 449 (Ga. Ct. App. 1968); a covert marijuana grow operation, *Bowers v. Farmers Ins. Exch.*, 991 P.2d 734 (Wash. Ct. App. 2000); and a methamphetamine laboratory, *Graff v. Allstate Ins. Co.*, 54 P.3d 1266 (Wash. Ct. App. 2002). In all three cases, smoke, fumes, and vapors from the unlawful activity left a residue that was ultimately characterized as contamination. The courts determined, however, that the malicious or deliberative component of vandalism is met when an individual acts with intentional disregard for the property rights of others. *See also Louisville & Jefferson Cty. Metro. Sewer Dist. v. Travelers Ins. Co.*, 753 F.2d 533, 536 (6th Cir. 1985) (explaining that "malice

6

may be presumed from the unlawful act itself," especially if it is evident that the act will result in property damage). Consistent with that conclusion, the employee's habitual use of methamphetamine inside the YMCA satisfies the ordinary meaning of vandalism. The resulting contamination is therefore excepted from the pollution exclusion.

    C.    **Smoke Exception**

While the parties do not contest that the damage suffered by YMCA was the result of its employee habitually using methamphetamine, (*see* Doc. 20 at ¶ 3(j)), they dispute the characterization of the resulting particulate matter. US Fire characterize it as "fumes" (not covered) while YMCA characterizes it as "smoke" (covered). YMCA has the better argument.

As was the case with "vandalism," the Policy does not define "smoke." Nevertheless, smoke can be reasonably interpreted to include the particulate matter that results from methamphetamine use. Montana courts have not addressed this question and the limited nonprecedential caselaw provides little guidance. *See, e.g., Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332, 1336 (Ore. Ct. App. 1993) (finding it unnecessary to address whether smoke includes vapor because there was evidence of smoke as defined by insurer). Smoke, like vandalism, must therefore be assigned its usual meaning. *Ribi*, 108 P.3d at 474. Generally, "smoke" is understood to describe the visible suspension of carbon or other particles in the air

7

emitted from a burning substance. *Smoke*, Merriam-Webster, www.merriam-webster.com/dictionary/smoke (last visited April 3, 2020) (defining "smoke" as the "gaseous products of burning materials especially of organic origin made visible by the presence of small particles of carbon" and "a suspension of particles in a gas"). Colloquially, the term smoke is often used to refer to the act of inhaling and exhaling the gaseous product of a burning material, such as smoking a cigarette or other illicit substances. *Id.* (also defining "smoke" as "something (such as a cigarette) to smoke").

US Fire disputes YMCA's assertion that its employee *smoked* methamphetamine by *burning* foil, instead arguing that the employee ingested methamphetamine *fumes* by *heating* foil. (Doc. 30-2 at ¶ 7.) But when applying the ordinary definition of smoke, this distinction is one without difference. From the viewpoint of a layperson untrained in law or the insurance business, *Giacomelli*, 221 P.3d at 672, when the YMCA employee used methamphetamine, the resulting byproduct results in the suspension of particles in the air emitted from the heated substance. This is consistent with the ordinary definition of smoke.

Moreover, the Policy uses the term "smoke" in both defining "pollutants" in the exclusion, (*see* Doc. 20 at ¶ 3(g)), and "specified causes of loss" in the exception, (*id.* at ¶ 3(h)). The simultaneous use of the same term in an exclusion

8

and exception gives rise to ambiguity. *Ribi*, 108 P.3d at 474. That ambiguity must be construed in favor of coverage. *Id.*

In light of the vandalism and smoke "specified causes of loss" exceptions, the pollution exclusion does not bar coverage.

## II. Criminal Act Exclusion

The Policy's criminal act exclusion bars coverage for any "[d]ishonest or criminal act (including theft)." (Doc. 20 at ¶ 3(f).) But it "[d]oes not apply to acts of destruction by [YMCA] employees . . . ." (*Id.*) The Policy does not define the term "acts of destruction." Montana courts have not had an opportunity to interpret the exception in this context, nor have other jurisdictions applied an analogous clause to similar facts. Indeed, this case may present a matter of first impression.

Once again US Fire argues that, like the vandalism exception to the pollution exclusion, the acts of destruction exception to the criminal act exclusion requires a showing that the employee acted with an intent to destroy the property that was damaged. According to US Fire, YMCA's employee was acting solely "to get high." (Doc. 30-1 at 16.) While YMCA does not contest that its employee was engaged in criminal conduct, it argues that the term "acts of destruction" contemplates "harm that substantially detracts from the value of property." (Doc. 26 at 29.) Though a close call, YMCA has the better argument.

9

The parties only substantively discuss one case that addresses the acts of destruction exception, *NMS Services, Inc. v. The Hartford*, 62 F. App'x 511 (4th Cir. 2003). In *NMS Services*, the Fourth Circuit determined that a former employee's act of installing hacking software that destroyed company records was a covered cause of loss. *Id.* at 514. US Fire seizes on specific language in *NMS Services* to extrapolate that an acts of destruction exception requires an intent element, specifically highlighting that the employee therein had a specific "plan" to destroy his employer's files. (Doc. 30-1 at 17.) However, *NMS Services* does not squarely address the intent question.

US Fire additionally attempts to bolster its intent argument by citing a footnote in a case pertaining to an employee's theft of copper wires. (Doc. 30-1 at 17–18 (citing *SA-OMAX 2007 L.P. v. Certain Underwriters at Lloyd's*, 374 S.W. 3d 594, 599 n.2 (Tex. Ct. App. 2010) (other citations omitted).) In what is known as the "copper crime" cases, some courts have extended coverage for damage resulting from the theft of copper wire and pipe because stealing copper often results in extensive property damage. *See* Morley Witus, *The Paradox of Insurance Coverage for Vandalism but Not Theft*, 56 Wayne L. Rev. 1747, 1750 (2010). But other courts have denied coverage for property damage if the crime was motivated by theft for profit rather than property destruction. *Id.*

These cases provide limited guidance, however, in situations where it is difficult to discern if an individual's actions are motivated by an intent to destroy or whether one is merely indifferent to the property rights of others. Here, for example, the YMCA employee was using methamphetamine to get high but intentionally concealed her use, "defaced and damaged the inside of a cabinet . . . to make what has been described as a 'drug den'," (Doc. 30-2 at ¶ 2), and specifically used methamphetamine in areas from which the HVAC spread the contamination, (*id*. at ¶¶ 5, 9). Her actions therefore go beyond what was necessary to merely "get high." And those actions, consistent with YMCA's argument, "substantially detract[ed] from the value of property." *Black's Law Dictionary*, 401 (9th ed. 2010) (defining "destruction"). Although US Fire asserts that a broad interpretation of the exception threatens to swallow the rule, construing the acts of destruction exception to be analogous with the vandalism exception provides greater internal consistency in the Policy. *See Farmers Alliance Mut. Ins. Co. v. Holeman*, 961 P.2d 114, 119 (Mont. 1998). The acts of destruction exception can therefore reasonably be read to include the YMCA employee's conduct here. Thus, the criminal acts exclusion does not bar coverage.

### III. Attorneys' Fees

Generally, Montana follows the American Rule under which a party in a civil action is not entitled to attorney fees absent a specific or statutory provision.

*Mountain W. Farm Bureau Mut. Ins. Co. v. Brewer*, 69 P.3d 652, 655 (Mont. 2003). However, Montana recognizes an exception to this rule where "the insurer forces the insured to assume the burden or legal action to obtain the full benefit of the insurance contract." *Id*. at 660; *Riordan v. State Farm Mut. Auto Ins. Co.*, 589 F.3d 999, 1006 (9th Cir. 2009). YMCA asserts that it is entitled to recover attorney fees if it is determined that coverage exists for its claims. (Doc. 26 at 33.) US Fire did not address this request.

Though it appears an award of fees may be appropriate under *Brewer* and *Riordan*, this case is somewhat unique. It was US Fire, not YMCA, that originally brought this action to determine coverage under the Policy. Though YMCA counter-claimed, (Doc. 10), it has since stipulated to the dismissal of its claims potentially related to US Fire's bad faith, (*see* Doc. 35). And, the application of both exclusions raised close questions under Montana insurance law. Thus, US Fire shall have the opportunity to address whether fees can or should be awarded.

## Conclusion

Based on the foregoing, IT IS ORDERED THAT YMCA's motion (Doc. 23) is GRANTED and US Fire's cross-motion (Doc. 30) is DENIED. The Clerk is directed to enter judgment consistent with this Order.[3]

---

[3] US Fire asserts in a footnote that if YMCA's motion is granted and coverage if found to exist, further proceedings will be required to establish the scope and value of covered damages. (Doc. 30-1 at 13 n.1.) Such relief, however, is not included

IT IS FURTHER ORDERED that US Fire shall respond to YMCA's request for attorneys' fees on or before **April 22, 2020**. YMCA may respond to that filing on or before **April 29, 2020**.

DATED this  9 th   day of April, 2020.

                                                   10:42 AM
Donald W. Molloy, District Judge
United States District Court

---

in US Fire's pleading, (*see* Doc. 1; Doc. 32 at 27), and is beyond the scope of this litigation, (*see* Doc. 34 at 13–14).